**Robert W. MURRE, Plaintiff,**

v.

**A.B. DICK COMPANY, Defendant.**

No. 84 C 4473.

United States District Court,
N.D. Illinois, E.D.

Oct. 23, 1985.

Ernest T. Rossiello & Associates, Chicago, Ill., for plaintiff.

John P. Lynch, Mark Stegemoeller, Latham & Watkins, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621–634, is currently before the court on the motion of defendant A.B. Dick Company for summary judgment. For the reasons set forth herein, the court concludes that plaintiff has produced no evidence from which a jury could reasonably infer that defendant discriminated against the plaintiff on account of his age. Summary judgment is therefore proper, and the defendant's motion is granted.

*Facts*

The undisputed facts, interpreted in the light most favorable to plaintiff, are as follows. Plaintiff Robert W. Murre was hired by defendant A.B. Dick Company on October 14, 1974, at age 39, as a senior engineer in the company's Niles, Illinois facility (Murre Dep. at 10). On September 19, 1976, he was promoted to project engineer, and on March 18, 1979, he was promoted to Section Manager of Electrical Design (Murre Aff. ¶ 14(F); Murre Dep. at 12–14). On October 24, 1982, Murre was demoted from section manager to "principal engineer." On August 17, 1983, Murre was discharged (Harling Aff. ¶ 2). A younger less senior engineer with the same job title, Michael Danielson, was retained. Danielson had been working for defendant about 7 years and was 30 years old at the time of the plaintiff's discharge (Harling Aff. Ex. C).

The decision to terminate plaintiff occurred during a reduction of the company's overall work force due to deteriorating financial conditions (Levin Aff. ¶ 2). From January 1982 through February 1984, the defendant's overall work force fell by 1116 persons, or 22% of its total, and the engineering staff in Niles was reduced from 142 to 74 persons (Harling Aff. ¶ 8). The work force reduction did not disproportionately harm older employees: the percentage of engineers working at the Niles facil-

ity who were 40 years old or above increased from 64% to 78%, and the average age of those engineers increased from 45.3 to 49.2 years old (*Id.*). At the time of his discharge, plaintiff was 48 years old.

In August of 1983, Gregory Pacton, Manager of Research and Engineering at Niles, learned that further work force reductions would have to be made from his group (Pacton Dep. at 31–32, 42–44; Pacton Aff. ¶¶ 2–4). Pacton testified that he decided to terminate Murre rather than someone else based on two chief considerations. First, Pacton discussed relative performance appraisals with Reginald Valentino, Product Development Manager of defendant's Imaging Systems Group. Valentino was responsible at that time for supervising Murre and other electrical and mechanical engineers (Pacton Dep. at 98–99; Valentino Dep. at 38–42). The two men also discussed expected contributions to the company based on anticipated project needs (Pacton Dep. at 99; Pacton Aff. at ¶¶ 2–4). Through a process of elimination, the two men went through all the employees under Valentino's supervision, and narrowed the choice down to plaintiff (Pacton Dep. at 47, 98–99).

During the above discussions, Pacton did not review Murre's personnel file but did review Murre's most recent performance appraisal, namely one prepared by Valentino in June of 1983. In that review, Valentino had criticized plaintiff's performance on several grounds, including his "coordination efforts to implement ... design concepts," his inability to execute long term assignments, his abrasive interaction with employees outside of his department, his failure to adjust his capabilities to the existing design environment, and his need to develop further software expertise (Valentino Dep. Def. Ex. 1). On the other hand, Valentino found plaintiff's performance competent in several areas: coordinate engineering usage of computer availability in certain programs, voice synthesis incorporation for defendant's products, communications with people within plaintiff's immediate work group, analytical skills, organization, scheduling capabilities, and adher-

ence to detail. Despite the above areas of strength, however, Murre's rating as to any one objective was never above "competent" and his overall rating was "low competent."

Valentino's evaluation of Murre's performance, interest level, and initiative was also noted by two earlier supervisors. In January 1982, Howard Wolfman, then Manager of Research and Engineering, submitted a performance review in which he concluded that "Murre's examples of standards of performance and motivation are not positive in nature—they tend to achieve the bare minimum level" (Murre Dep. Def. Ex. 1). Wolfman gave Murre an overall rating of "low competent" and noted that Murre was a "clock watcher" with no consistent ability to seek out problems and aggressively solve them. In October 1982, Wolfman's replacement and Pacton's immediate predecessor, Richard Fehlberg, demoted Murre from "senior" to "principal" engineer based on his "assessment of the future organizational needs and [Murre's] technical qualifications and current performance level which I would rate as Low Competent." (Fehlberg Dep. Def. Ex. 1). Fehlberg, however, also testified that plaintiff was "doing a competent job in his area of technical responsibility" and performed quite well as principal engineer in the early months after his demotion (Fehlberg Dep. at 31).

At the time of the August 1983 reduction in work force, Murre was the oldest of the six electrical engineers under Valentino's supervision (Harling Aff. ¶ 3). He also had the lowest performance rating of these six engineers (*Id.*). Michael Danielson, the only other "principal" electrical engineer, had an overall rating of "commendable." Valentino and Pacton both testified that Danielson was retained over Murre because of his superior performance appraisals, his initiative, ability to work long hours, ability to communicate with others, and his microprocessor background (Valentino Dep. Def. Ex. 1; Valentino Dep. at 75; Pacton Dep. at 99).

Valentino and Pacton purportedly considered the entire engineering staff, not just the electrical engineers, in deciding whom to discharge as part of the reduction in work force (Pacton Dep. at 97–99). While plaintiff was the oldest of the six electrical engineers, the other engineers under Valentino's supervision ranged in age from 35 to 59 years of age (Harling Aff. ¶ 3). With one exception, these engineers received performance appraisals of "competent" or better. The one engineering staff person who received a lower rating than plaintiff but who nonetheless was retained was 59 years old (*Id.*).

Plaintiff was informed that he was terminated due to a reduction in work force (Murre Aff. ¶ 2). Around this same time, he was informed by Randolph Harrison, defendant's Vice-President of personnel, that he would be notified of any future job openings for which he could apply (Murre Aff. ¶¶ 6, 14(D)). In the fall of 1983, both an "engineer" and a "senior engineer" position became available at the Niles facility due to the departures of others (Valentino Dep. at 120; Pacton Aff. ¶ 5). By definition, these positions were junior to that occupied by plaintiff at the time he was discharged. In November, Valentino and Pacton prepared job requisitions for both positions which listed a Bachelor of Science in Electrical Engineering and experience in 6809 microprocessors or Intel 8085–8086 Microprocessors as job requirements (Valentino Dep. Def. Ex. 2). Valentino and Pacton testified that these requirements reflected their goal of upgrading the microprogramming skills of the electrical engineering staff (Pacton Dep. at 104; Valentino Dep. at 87–88).

Despite Harrison's promise to inform plaintiff of future job openings, defendant never formally notified plaintiff of the two openings (Murre Aff. ¶ 7). Murre nonetheless learned of the job openings from employees of defendant with whom he maintained contact and applied for both positions (Murre Dep. at 47). Murre was interviewed by Pacton on January 4, 1984 (Pacton Dep. at 54). The two men discussed Murre's microprocessor software

capability in depth (Murre Aff. ¶ 14(a)(2)). Murre told Pacton that he had done some microprogramming at home on a Radio Shack computer (Pacton Dep. at 54), and would therefore need a little time to become proficient on the microprocessors proposed for use by defendant (Murre Aff. ¶ 11).

Pacton considered Murre's home computer experience to be irrelevant to defendant's microprogramming needs and to render him unqualified for either of the two engineer openings, despite Murre's previous employment in higher level positions (Pacton Dep. at 64, 100; Pacton Aff. ¶ 11). While Murre challenges this assessment of his qualifications, he admitted at his deposition that he had not done any actual microprogramming (Murre Dep. at 23), that he was not fluent in the assembly language used in microprogramming (Murre Dep. at 26), and that he had only "limited experience" in microprogramming development (Murre Dep. at 27). When asked about his experience in microprogramming Murre claimed no college training nor any actual work experience in the field, only "activities that [he] had done on [his] own" (Murre Dep. at 59).

In addition to feeling that Murre was unqualified because of his computer background, Pacton also felt that Murre would not respond well to working in positions junior to his previous job as principal engineer (Pacton Dep. at 54–57; Pacton Aff. at ¶ 12). Murre, however, had told personnel vice-president Randolph Harrison that he was willing to accept such positions in order to achieve the required vesting rights for his pension (Murre Aff. ¶ 14(G)), and Fehlberg testified that Murre had adapted well immediately following his earlier demotion (Fehlberg Dep. at 31). There is no evidence, however, that Pacton was aware of either of these factors at the time he made the decision not to rehire plaintiff.

Murre was told after his interview to call back in a few days (Murre Dep. at 43). Murre did so, and was told that defendant had not yet talked with all the internal

candidates (*Id.*). After waiting some further unspecified time, Murre phoned Pacton to confirm that he really had been given consideration for the jobs (Murre Dep. at 45). Pacton told Murre that he had been considered, but that his lack of experience in microprocessor software programming rendered him unqualified for the job (*Id.*). After learning that other interviewees had been given immediate offers, Murre asked Harrison why he hadn't been given a similar offer on those positions (Murre Dep. at 45–46). Despite a promise to notify Murre in writing of his findings, Harrison never got back to Murre (*Id.*). Around this same time, plaintiff filed his charges of discrimination with the EEOC.

In February 1984, Valentino and Pacton interviewed Husam Rabi, age 25, for the entry level engineer position which had been denied plaintiff (Valentino Aff. ¶ 9; Pacton Aff. ¶ 8). Rabi, then an A.B. Dick employee, was recommended by his supervisor for the job. His resume reflected the job requisition requirements of a bachelor's degree in electrical engineering and hands-on training in the use of the Intel 8085 microprogrammer (*Id.*). Rabi was hired on March 12, 1984, as an electrical engineer (Harling Aff. ¶ 4). Rabi proved to be ignorant of basic semi-conductor theory (an area within Murre's expertise), and resigned on or about May 4, 1984 (Kopala Dep. at 26). During the time he worked for Valentino, he did no microprocessor software development (Valentino Dep. at 104; Kopala Dep. at 26).

Shortly after Rabi left, defendant hired one Peter Tamulewicz, age 29, for his replacement (Murre Aff. ¶ 12). Tamulewicz was hired out of a "job fair" held in Chicago in May of 1984. At the job fair, Tamulewicz talked with defendant about his direct Intel 8080 assembly language microprogramming experience (Reynolds Aff. ¶ 2; Tamulewicz Dep. at 13–15). His resume reflects this experience, at least one college course in microcomputers, and a bachelor's degree in electronic engineering technology from the DeVry Institute of Technology (Reynolds Aff. Ex. A). Tamulewicz interviewed with Pacton and Valentino shortly after the job fair; both men asked him about his microprocessing background (Tamulewicz Dep. at 15–16, 24). Like Rabi, however, Tamulewicz was never given any assignments requiring microprocessor software skills, or any work involving defendant's microprocessor (*Id.* at 17; Kopala Dep. at 40).

At a job fair held later that summer, defendant interviewed Miriam Chou, a graduate student in electrical engineering at the University of Illinois-Chicago, for an entry-level position in Valentino's group (Chou Dep. at 25–26). Chou was interviewed about her microprocessor background both at the fair and on a call-back interview (Chou Dep. at 16–18, 20). Chou's resume (Chou Dep. Def. Ex. 1) indicates a laboratory course in the Intel 8085 microprocessor but no prior employment experience in microprocessing. Defendant hired Chou in September of 1984. Chou testified that she did a large amount of microprocessor software development work during her first four months with defendant (Chou Dep. at 22–23), but apparently is spending only about ten percent of her current time in microprocessor development (Stumpf Dep. at 32, 37). Stanley Kopala, an electrical engineer with defendant, testified that Chou had done no work on microprocessor software development (Kopala Dep. at 40). This latter testimony is inconsistent with Chou's log books, which indicate such work. Chou also testified that she received further instruction in microprocessing after being hired (Chou Dep. at 34–37).

In November of 1984, defendant hired Olgerts Cakars, age 60, in the "senior engineer" position for which Murre had interviewed the previous January. Cakars was told by Stumpf and Valentino at a job fair that A.B. Dick was looking for somebody with microprocessor hardware and software experience (Cakars Dep. at 39–40), and Cakars was hired in part on the basis of his microprocessor qualifications (Cakars Dep. at 30–33, 39–40; Valentino Aff. ¶ 10). Cakars also has a bachelor of science degree in electrical engineering (Valentino Dep. Def. Ex.). Immediately after

being hired, Cakars began full-time work on developing a 2500–line program for defendant's Motorola 6809 microprocessor (Cakars Dep. at 16–17; Valentino Aff. ¶ 10). As of August 1, 1985, 33 of 41, or 83%, of Valentino's salaried engineering staff, were over age 40. (Harling Aff. ¶ 5).

*Legal Discussion*

To establish a prima facie case of age discrimination, a discharged employee must produce evidence from which a court or jury can reasonably infer that, more likely than not, but for the plaintiff's age he would not have been discharged. *Matthews v. Allis-Chalmers,* 769 F.2d 1215, 1217 (7th Cir.1985). In several cases, the Seventh Circuit has held that the burden of proof formula set forth for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies in cases under the ADEA. *Matthews,* 769 F.2d at 1217; *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1222 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Under that formula, an ADEA plaintiff may establish a prima facie case of firing discrimination by showing that: 1) he belongs to the protected age group; 2) he was performing his job satisfactorily; 3) he nevertheless was fired; and 4) his employer sought someone to perform the same work after he left. *Matthews,* 769 F.2d at 1217; *Kephart,* 630 F.2d at 1222–23.

Because this last element—rehiring of another—rarely occurs when an ADEA plaintiff is fired during a reduction in work force, the Seventh Circuit in *Matthews* fashioned specific prima facie requirements to be applied in a job reduction situation. Citing the Fifth Circuit decision in *Williams v. General Motors Corp.,* 656 F.2d 120, 128–29 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982), the Seventh Circuit held that a plaintiff in the protected age group adversely affected by a reduction in work force can meet his prima facie burden by 1) showing that he was qualified to assume another position at the time of the discharge or demotion; and 2) producing direct or circumstantial evidence from which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of age. *Matthews,* 769 F.2d at 1217. *See also Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 96–97 (7th Cir. 1985) (older employee fired in work force reduction needn't prove replacement by younger employee to state prima facie case).

Once a plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason" for the employment decision. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. at 1824. Should the defendant state a valid justification for the firing, the employee must proffer evidence to show that the employer's stated reason was a mere pretext for discrimination. 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of proving unlawful discrimination remains with the plaintiff at all times. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Parker v. Federal National Mortgage Association,* 741 F.2d 975, 978–79 (7th Cir.1984).

Where a plaintiff has relied solely on the *McDonnell Douglas* framework as evidence of discrimination, the Seventh Circuit has repeatedly held that failure to proffer evidence which would establish the pretextual nature of an employer's articulated motive justifies a grant of summary judgment in the employer's favor. *Klein v. Trustees of Indiana University,* 766 F.2d 275, 282 (7th Cir.1985); *Parker,* 741 F.2d at 979–980; *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 366 (7th Cir.1983). In making this determination, a district court should avoid weighing conflicting indications of motive and intent: "a plaintiff should be required to do no more than offer proof which casts doubt upon the veracity of the employer's stated reason for its action." *Stumph v. Thomas &*

*Skinner, Inc.,* 770 F.2d 93, 98 (7th Cir. 1985). Mere quarrels over the business judgment of the employer, however, are insufficient to meet this burden. *Kephart,* 630 F.2d at 1223.

In the present case, plaintiff has alleged that defendant discriminated against him both by discharging him during the August 1983 reduction in work force, and by refusing to rehire him in January of 1984 for either of the electrical engineer positions which had subsequently become available. Plaintiff has offered no direct evidence of discriminatory intent on the part of either Valentino or Pacton, who were chiefly responsible for these decisions, nor has he presented any direct evidence that others at A.B. Dick were biased against older employees. Plaintiff's case therefore falls squarely within those cases which rely on the *McDonnell Douglas* framework as circumstantial evidence of discrimination.

### 1. *Discriminatory Discharge*

Implicit in the majority per curiam opinion of *Matthews* is the holding that the discharge of an older employee pursuant to a valid reduction in work force does not in itself give any rise to an inference of unlawful discrimination, regardless of the employee's age or competence. 769 F.2d at 1221–1222 (Flaum, J., concurring). Because work force reduction cases by definition involve a legitimate motive for discharge on the employer's part, an ADEA plaintiff is therefore relegated to his ultimate burden of showing evidence, direct or circumstantial, from which a jury could reasonably conclude that but for the employee's age, he would not have been discharged.

In the present case, plaintiff offers no statistical evidence to show that the work force reduction itself was pretextual, or that the reduction had a differential impact on younger and older employees to the latter group's disadvantage. Indeed, such an effort would be futile, since the undisputed statistical evidence shows that the reduction benefited older workers on the whole. Plaintiff instead relies on the more favorable treatment given Danielson during the reduction in force as circumstantial evidence of discrimination.

The parties have debated with some vigor whether defendant's differential treatment of Danielson and plaintiff suffices to establish a prima facie case. The per curiam decision in *Matthews* suggests not, at least absent further evidence that the reason for preferring Danielson was unlawful age discrimination. As stressed by Judge Flaum in his concurrence, however, the retention of a younger employee in the same job as that held by the discharged plaintiff "gives rise to an inference of discrimination that is no weaker than the well-recognized inference created when an employer discharges an employee who is performing adequately and then seeks and/or obtains a replacement." 769 F.2d at 1223. Because the employer is in the best position to articulate the reason for the different treatment, Judge Flaum argues that the burden of production should shift to the employer at this point.

The debate between the majority and concurring views in *Matthews* is largely academic, since it is well established that the burden of showing pretext merges with the plaintiff's ultimate burden of showing intentional discrimination. *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095; *La Montagne,* 750 F.2d at 1414. In *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court stressed that the *McDonnell Douglas* order of proof is only a framework for allocating the burdens of production in an employment discrimination case, and should not mechanistically be applied to avoid the ultimate question of discrimination. 460 U.S. at 714, 103 S.Ct. at 1481. This court reads *Matthews* not as automatically incorporating the burden of showing pretext into a plaintiff's initial burden of production, but as recognizing that such a burden is necessary to defeat an employer's articulated motive for discharge on a motion for summary judgment. Proof that younger employees were retained in a position for

which the plaintiff was qualified may, under certain circumstances, satisfy this circumstantial burden. Under either the majority or concurring view in *Matthews,* the ultimate inquiry remains whether there is direct or circumstantial evidence sufficient to create a triable issue as to age discrimination.

In accordance with this understanding, the court assumes that plaintiff has made out a prima facie case of age discrimination based on defendant's decision to terminate him instead of Danielson. Plaintiff was, after all, rated as a "competent" principal engineer, although barely so, and was therefore "qualified" to be retained, despite the evidence of serious dissatisfaction with his performance. Were the defendant's decision to retain a younger man in plaintiff's job position left unexplained, the evidence might suffice to raise a triable issue as to discriminatory intent. Defendant has proffered a legitimate explanation for the difference in treatment, however, and it is therefore up to plaintiff to proffer some evidence from which a jury could infer that those reasons are pretextual.

█ In the present case, plaintiff has offered testimony from co-workers and from his former supervisor Richard Fehlberg to suggest that his work as a principal engineer was more than competent, but has offered no evidence to show that defendant's superior estimate of Danielson was tainted by discrimination. The ADEA was not intended as a vehicle for judicial review of business decisions, *Kephart,* 630 F.2d at 1223, and an ADEA plaintiff can therefore not raise a triable issue of age discrimination simply by arguing about the fairness of the defendant's evaluation of his work performance, even with testimony from co-workers or other employees of defendant. *Id.* While exceptional cases may exist where the unfairness is so blatant as to render the articulated motive unworthy of belief, this is not such a case. The sole evidence plaintiff offers to suggest that Valentino was biased against him is that plaintiff earned more money than Valentino, even though the latter was plaintiff's

supervisor. This allegation, even if true, has nothing to do with age discrimination.

█ The undisputed evidence in this case shows that every person involved in making the decision to terminate plaintiff viewed Danielson as a superior performer, especially in areas of initiative and willingness to upgrade skills. The facts further suggest that defendant considered Danielson's greater expertise in microprocessing to suit the company's future needs beyond what plaintiff could offer. Even were the court to allow plaintiff to impeach Valentino and Pacton by showing that others at A.B. Dick considered him competent, plaintiff has offered no testimony from anyone that he was unquestionably superior to Danielson, nor has he proffered any evidence that the managerial staff at A.B. Dick disagreed with Valentino's negative assessments. What evidence there is in the personnel record only supports Valentino's assessment of plaintiff's job performance.

Comparing plaintiff with the engineering staff generally, the court similarly finds no evidence of discrimination. Plaintiff was the lowest ranked electrical engineer at the time of his discharge and was therefore a likely candidate to be terminated during the reduction in work force. That defendant fired him and not a mechanical engineer does not suffice to show age discrimination since many of the mechanical engineers retained by defendant were older than plaintiff, and since the only engineer with a lower rating than plaintiff's but who was retained was substantially older than plaintiff. The Seventh Circuit has made clear that employment discrimination cases should not be allowed to go to trial on the unsubstantiated assertion that a defendant's decision to discharge an employee "might" have been discriminatory. Because plaintiff has presented no evidence to support the inference that age played a role in defendant's decision to discharge him, summary judgment for the defendant is proper on plaintiff's claim of unlawful discharge.

## 2. *Refusal to Rehire*

To establish a prima facie refusal-to-hire case under the *McDonnell Douglas* formula, a Title VII or ADEA plaintiff must show, among other things, "that he applied and was qualified for a job for which the employer was seeking applicants" and "that, despite his qualifications, he was rejected." 411 U.S. at 802, 93 S.Ct. at 1824. In the present case, the court concludes that plaintiff has failed to raise an issue of material fact regarding his qualifications for either of the two engineer positions which arose after his termination, and, therefore, has failed to establish a prima facie case of age discrimination based on the defendant's January 1984 refusal to hire him.

The undisputed evidence shows that in November 1983, Pacton and Valentino, for whatever reasons, determined to require a bachelor of science in engineering and some direct experience in microprocessing as requirements for both of the positions which plaintiff sought. As Pacton described it, the company was moving from "traditional mechanical products" toward "much more sophisticated microprocessor controls" and therefore needed engineers capable of adapting these microprocessors "to our existing equipment as well as inclusion in new products" (Pacton Dep. at 99–100). While engineers on staff were to be trained in microprogramming (Pacton Dep. at 71–72), newly hired engineers were required to have some such training in their backgrounds (Pacton Aff. ¶ 5).

■ Murre has challenged the legitimacy of Valentino's and Pacton's purported need for microprogramming, and has also challenged Pacton's assessment of Murre's microprocessing abilities. Both efforts are fundamentally misguided. The ADEA was not intended to allow judicial review over the reasonableness of an employer's business judgments, *Kephart*, 630 F.2d at 1223, unless those business judgments are used to mask unlawful discrimination. The evidence shows that every single new entrant into the electrical engineering at Niles was interviewed about his or her microprocessing background and that only candidates who fitted the job requisition requirements as set forth in the November 1983 description were offered the job. Moreover, as is further suggested by defendant's hiring of Olgerts Cakars, a 60–year old, for the "senior engineer" position, these criteria were applied in an age-neutral fashion. It is not this court's province to review the business judgment of defendant in requiring microprocessing experience on the above machines. Absent evidence that defendant waived the requirements for younger employees, of which there is none, plaintiff cannot create a triable issue of age discrimination by complaining that defendant strictly applied its job requirements.

■ Plaintiff's challenge to the veracity of the B.S.E.E. requirement is only marginally more successful. Plaintiff points out that the B.S.E.E. degree was never discussed during his interview, that defendant in the past has hired non-degreed engineers, and that Tamulewicz only held a bachelor of electronical engineering technology degree from a technical school and therefore did not begin to meet the requirements of a B.S.E.E. degree (Murre Aff. ¶ 14(A)). That defendant only began to require educational credentials in 1983 does not, however, strike the court as sufficient grounds for creating a triable issue on pretext. Changes in managerial policy are legitimate bases on which to make employment decisions.

Regarding Tamulewicz's allegedly defective credentials, plaintiff offers no testimony other than his own to discredit Tamulewicz's education. Defendant is legally entitled to consider a bachelor's degree in electrical engineering technology to be equivalent to a B.S.E.E. degree and plaintiff has offered no evidence that older applicants with technical degrees were turned away. Under these circumstances, defendant's decision to hire Tamulewicz does not in any way raise the inference that its B.S.E.E. requirements were false. In any event, the chief reason for the decision not to hire plaintiff appears to have been his lack of microprogramming experience, and

the evidence is undisputed that all applicants who were hired met that requirement.

In a somewhat similar vein, Murre attempts to challenge Pacton's assessment of him as being unwilling to assume a lower level position, when he had in fact informed Harrison of his willingness to assume such a job. There is absolutely no evidence, however, that Pacton was aware of this conversation, and the court will not allow a case to go to trial simply on the unsupported allegation that Harrison may have mentioned this fact to Pacton and that Pacton therefore knew his own, contrary, assessment was incorrect.

Murre's challenge to Pacton's assessment of his own microprocessor abilities is equally misguided. While Murre had done feasibility studies for microprocessors (Murre Dep. at 21), and while some of his co-workers have testified that they considered Murre "qualified" for the entry level and senior engineer positions, Murre confirmed at the time of his deposition that he had little, if any, microprogramming experience (Murre Dep. at 22–23, 26–27, 59). Murre further confirmed that he had had no college training or courses in microprogramming. The defendant's failure to consider Murre's home training as evidence of being qualified for both positions by itself raises no inference of discrimination. The job requisitions explicitly require experience in use of 6809 or Intel 8085–8086 microprocessors which Murre did not have. Whatever the utility of Murre's home training, it is not what defendant required. Neither plaintiff's own opinion about his microprocessor qualifications, nor that of his co-workers, creates a triable issue on the veracity of defendant's articulated motive for not hiring plaintiff in 1984. *See Kephart,* 630 F.2d at 1223 (plaintiff does not make out a case of age discrimination by offering contrary assessments of his qualifications from co-workers).

■ Plaintiff does, however, attempt to argue that the requirement of microprocessor skills was a mere pretext for age discrimination through his evidence that nei-

ther Rabi nor Tamulewicz actually performed such work, that Chou was hired with only prior lab experience in microprocessing work, and that in any event Chou was given the opportunity for further on-the-job training which had been denied him through the imposition of the microprocessing requirement in the first instance. The court agrees that evidence of whether asserted job requirements were actually required later on would be relevant to determining whether the job qualifications were false. On the present facts, however, no such inference of spuriousness reasonably can be made.

While it is true that Rabi and Tamulewicz were given no microprocessing tasks to do, microprocessing hiring requirements *were* applied to all candidates in the interview and hiring process. Plaintiff's argument would require a jury to believe that Pacton and Valentino engineered phony job criteria prior to plaintiff's application, then maintained those phony criteria for all subsequent engineer openings even after plaintiff had been rejected, and then finally hired a 60–year old on the basis of those requirements, simply to provide some objective basis for masking unlawful discrimination. As the Seventh Circuit has stressed, it is not the court's job on a motion for summary judgment to make every conceivable inference in favor of the party opposing the motion: only *reasonable* inferences need be drawn. *Matthews,* 769 F.2d at 1218; *Parker,* 741 F.2d at 980. That defendant may have incorrectly assessed its need for microprocessing skills on the part of its engineers does not impeach the veracity of its decision to make such skills a prerequisite for the job where the record shows consistent and age-neutral application of those criteria to new applicants. Defendants could lawfully insist on microprogramming skills for their engineering staff whether or not they had specific, immediate projects in mind. *See Matthews v. Allis-Chalmers,* 35 F.E.P. 1404, 1406 (N.D.Ill.1984), *aff'd,* 769 F.2d 1215 (7th Cir.1985) (court should not "substitute its judgment for the company's as

to what business skills particular jobs require").

Analogously, that defendant hired Chou on the basis of laboratory microprocessing experience alone does not create a triable issue on discriminatory bias since plaintiff did not apply for the position into which Chou was hired, and since there is no evidence that older employees with experience analogous to Chou's were turned away. Even assuming that the November 1983 job requisitions would govern, those requisitions do not require actual employment experience with Intel 8085 microprocessors, only "experience," which could easily encompass Chou's laboratory training. Certainly, plaintiff is not unreasonable in arguing that his overall familiarity in the electrical engineering field should have rendered him a more qualified candidate than Chou for many of defendant's purposes. Nonetheless, plaintiff never competed with Chou for a job opening, and the fact remains that Chou had specific experience, admittedly within a narrow area, which plaintiff lacked. That defendants concentrated on this narrow area in making hiring decisions is not evidence of discrimination.

Plaintiff has made other arguments which merit brief discussion. First, plaintiff points out that Cakars was not hired for the senior engineer until after plaintiff's lawsuit was filed, and that a jury could reasonably infer the purpose of Cakars' hiring was to cover up the past discrimination directed against plaintiff. Plaintiff does not dispute, however, that Cakars' interview was dominated by discussion of microprocessing, nor that Cakars was immediately assigned a major software development project utilizing those skills. As defendant correctly argues, it would be irrational for a company to risk a new product development simply to present the appearance that age was not a factor in its hiring decisions. This hypothesis is especially unlikely given the procedural history of this case: defendant hired Rabi, Tamulewicz, and Chou throughout this same period despite their younger ages, and at the time Cakars was hired plaintiff had not

alleged rehiring discrimination in this lawsuit.

Plaintiff also argues that a triable issue of discrimination inheres in the fact that he was given a "runaround," both by Harrison, who never informed plaintiff of the new job openings nor wrote Murre about the reasons for the refusal to rehire, and by Pacton, who apparently put off telling plaintiff that he wouldn't be rehired. Again, however, these facts are without probative significance. There is simply no evidence whatsoever that Harrison had any input into Pacton's decision not to hire plaintiff; Harrison's motives are therefore irrelevant. *See La Montagne*, 750 F.2d at 1412. More fundamentally, plaintiff has offered no evidence that the above personnel policies were unusual for defendant or that they were applied in a discriminatory fashion. While successful applicants were contacted immediately, plaintiff has offered no evidence that younger unsuccessful applicants were given better treatment than he was. This court cannot infer an intent to discriminate on the basis of age simply because the defendant has bad personnel practices.

Plaintiff finally argues that there is a genuine dispute about qualification since he had previously held both of the positions for which he applied and since both were below the highest position which he held during his nine year employment with defendant (Murre Aff. ¶ 9). It is understandably frustrating for the plaintiff to witness a change in hiring practices which excludes him from positions for which he would once have been eminently qualified. Both Pacton and Valentino have consistently testified, however, that the change in hiring criteria was based on present and anticipated changes in technology. Pacton further testified that he perceived plaintiff to be uninterested in developing new expertise. There is no evidence that the change in hiring practices was engineered as a pretext for harming older employees, or for preventing plaintiff from being rehired with the company. Summary judgment is

therefore proper on plaintiff's rehiring claim as well as his discharge claim.

### Conclusion

Where, as here, a plaintiff attempts to prove discriminatory intent solely by circumstantial evidence, the question of sufficiency to defeat a motion for summary judgment goes to the reasonableness of drawing the necessary inference of discrimination from the indirect evidence. The court has reviewed all of the evidence, both singly and in combination, and simply finds no evidence from which a jury could rationally find age to be a determining factor in the plaintiff's discharge or the defendant's failure to rehire him in January of 1984. Accordingly, the defendant's motion for summary judgment is granted.

It is so ordered.