**Laurie KOLSTAD, Respondent,**

v.

**FAIRWAY FOODS, INC., Appellant.**

No. C2-90-230.

Court of Appeals of Minnesota.

July 3, 1990.

Steven W. Zachary, Calvin L. Scott, Zachary & Associates, St. Paul, for respondent.

Mark B. Rotenberg, Agnes M.E. Schipper, Dorsey & Whitney, Minneapolis, for appellant.

Considered and decided by HUSPENI, P.J., and PARKER and FOLEY, JJ.

## OPINION

PARKER, Judge.

Fairway Foods, Inc., appeals, by writ of certiorari, the finding of an administrative law judge (ALJ) that it engaged in unfair, gender-based discriminatory practices with regard to Laurie Kolstad, a former employee. The ALJ found Fairway discriminated against Kolstad by giving her an ultimatum to resign or be put on 30 days' probation and by giving higher compensation to Kolstad's male successor for similiar duties. Fairway argues that Kolstad failed to carry her burden of proving that its articulated reason for her departure and the disparate pay were a pretext for discrimination. Fairway also asserts that the ALJ's findings of fact and conclusions of law are not supported by substantial evidence in the record. We affirm as modified.

## FACTS

Laurie Kolstad began working for Fairway Foods as a transportation clerk in 1983. In September 1986 she was promoted to the position of management trainee/inventory coordinator. She was regarded by management as a dedicated, assertive and hard-working person. She became the first female to hold a position directly supervising warehouse employees. She had no prior supervisory experience.

As a management trainee on the 10 p.m. to 6 a.m. shift, she oversaw warehouse inventory control operations, directly supervising two to three employees plus other warehouse personnel in the absence of the shift supervisor.

The night transportation supervisor from September 1986 through February 1987 was Randy Mittag, who was responsible for all ten employees on that shift, directing truck drivers and warehouse employees, authorizing changes on routes and loads, substituting drivers and resolving all loading problems. The night shift was scheduled to be reduced to four warehouse employees and a janitor as of March 1, 1987, with Mittag switching to an earlier shift. Mittag, informed of the change in January 1987, decided to resign rather than work different hours.

Upon learning of Mittag's resignation, the management team decided to assign Kolstad management responsibilities between 2 a.m. and 6 a.m. starting February 15, 1987, with other supervisors assisting her during those hours until March 1, 1987, when the night shift was to be reduced. Kolstad asked several managers if she could be given Mittag's job and was told she was being considered for it. On February 12, 1987, Kolstad saw a memorandum posted on a manager's office door that she would provide primary coverage from 2 a.m. to 6 a.m. in Mittag's absence.

On March 1, 1987, Kolstad became the sole supervisor between 2 a.m. and 6 a.m. She supervised the four warehouse employees, a cycle counter, a billing clerk and approximately 8–15 incoming truck drivers per night. She thus took over Mittag's previous duties, though with fewer persons to supervise and fewer loads to deal with, in addition to the inventory duties she had performed since September. She was given no raise in salary or change in title. Sometime in March 1987 Kolstad was informed without further explanation that Mittag's position had been dissolved.

Between March 1 and mid-June 1987, Kolstad became frustrated, feeling that her shift was understaffed and that she sometimes had to perform tasks that diverted her from supervisory duties. She voiced these complaints to her immediate supervisor, Paul Johnson, and the other managers. She also complained about the work of other managers.

Management also became increasingly dissatisfied with Kolstad's failure to adhere to its directives to focus more inwardly and

less on the responsibilities of others. Johnson also became concerned with her difficulties in delegating responsibilities and her reported mood shifts. Yet Johnson also expressed general satisfaction with Kolstad's work performance and that of the employees she supervised, telling her personally that she was doing a good job. Johnson testified that he felt Kolstad caused more problems than any other employee, yet Kolstad received no warnings about poor performance from management and was considered to be a hard-working, dedicated employee by co-workers.

On June 17, 1987, Kolstad met with Johnson for more than two hours to discuss her problems, again complaining that she could use additional staff on her shift, that others' shortcomings were making her job more difficult, that she might prefer to do physical work and not supervise others, and that maybe she should resign.

Johnson and another managerial employee thereafter drafted a letter to her that concluded that it was in Kolstad's and Fairway's best interests for her to resign. They attached a resignation letter. The letter stated that if she did not resign, her performance would be evaluated over the next 30 days and that if no "dramatic improvement" were shown she would be terminated without severance pay, which she would receive if she resigned immediately.

Johnson presented this letter to Kolstad on June 19 with no further definition of what would constitute a "dramatic improvement," although she asked for an explanation. Johnson did not discuss her performance at all and told her she had to decide that day whether or not she would resign immediately.

The letter stunned Kolstad and she testified that she concluded she had no choice but to resign. She was not offered an opportunity to transfer to another position at Fairway, although she had observed at least one other salaried employee who was so transferred after friction between that employee and a supervisor.

Evidence was presented that a salaried employee, also supervised by Johnson, received a written warning from him stating that future attendance problems would result in additional disciplinary action, including suspension without pay and/or termination. Johnson testified that he was unaware that salaried employees could be suspended; this testimony appeared to be contradicted by Johnson's actions toward the employee he warned.

After Kolstad departed, Fairway hired a male at a starting salary of $19,500 to fill her position, for which she had been paid $17,000. The man hired had a B.A. in business administration, 21 months of supervisory experience in a furniture factory, and four years of experience in the grocery business. This position did not require a college degree and neither Kolstad nor Mittag had one. Kolstad would have been eligible, by September 1987, for an increase in pay of up to 20 percent, raising her salary to $20,400.

After receiving unemployment compensation for 2.25 months, Kolstad began work as a welder making $7.55 per hour, with quarterly increases to $8.80 per hour by November 1988. She was injured on the job in 1988 and was laid off in March 1989. She is no longer able to work as a welder due to the work injury and resultant surgery on both wrists. There was evidence of several other stressors in her life between the time she lost her job at Fairway and the hearing on this suit in 1989.

In December 1988 Kolstad was evaluated by John Taborn, Ph.D., a licensed consulting psychologist, who met with her for two hours. He attributed part of her "moderately severe depression/anxiety" to her perceived unfair treatment by Fairway.

Kolstad was also evaluated, on behalf of the defense, by Phillip Haber, Psy.D., in August 1989. He concluded that since Kolstad had not sought any psychological treatment, she was not experiencing "significant psychological pain" and that she suffered from hypothyroidism, which also could cause depression.

Kolstad presented the testimony of three non-supervisory Fairway employees, the only female management employee during

Kolstad's tenure at Fairway, Dr. Taborn and herself. Fairway presented the testimony of Dr. Haber and three managerial employees at Fairway, including Kolstad's immediate supervisor.

The ALJ concluded that Fairway unfairly discriminated against Kolstad on the basis of gender in regard to her compensation and their treatment of her in relation to her departure from Fairway's employ. The ALJ ordered compensatory damages of $20,394, including a $728 wage differential from March 1 to June 19, 1987 (comparing her wage to that of her replacement): $14,-721, the difference between what she actually earned and what she would have received had she stayed at Fairway, for the period from June 19, 1987, to August 1989; and $4,875 for vocational training based on Dr. Haber's testimony that she might require 30–90 days of such training.

The ALJ also awarded her $1,000 for mental anguish, $3,000 in punitive damages and attorney fees of $15,636. The state was awarded a civil penalty of $3,000. Fairway appeals all of the above conclusions, the award of damages and attorney fees.

## ISSUES

1. Was there substantial evidence to support the ALJ's conclusion that Fairway's conduct in requiring immediate resignation or 30 days' probation was an unfair discriminatory practice?

2. Was there substantial evidence to support the ALJ's finding that Fairway discriminated against Kolstad on the basis of her gender with regard to compensation?

3. Was there substantial evidence to support the ALJ's award of actual compensatory, mental suffering, vocational, punitive and civil damages?

4. Did the ALJ abuse her discretion in the award of attorney fees to Kolstad?

## DISCUSSION

■ This court may reverse or modify administrative agency decisions for cases brought under Minn.Stat. § 363.071, subd. 2 (1986), when the administrative findings are unsupported by substantial evidence, arbitrary and capricious, or in error as a matter of law. Minn.Stat. § 14.69 (1986); *see State by McClure v. Sports & Health Club*, 370 N.W.2d 844, 854 n. 17 (Minn. 1985) (an agency's decision of law is reviewed de novo). A reviewing court must not substitute its view of the evidence for that of the ALJ. *Dakota County Abstract Co. v. Richardson*, 312 Minn. 353, 356, 252 N.W.2d 124, 126–27 (1977).

### I

The U.S. Supreme Court has laid out a three-step analysis for evaluating employment discrimination claims which requires (1) establishment by the employee of a prima facie case of such discrimination; (2) articulation by the employee of a legitimate nondiscriminatory reason for the employee's treatment; and (3) a rebuttal of the employer's reasons showing them to be a mere pretext for illegal discrimination. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). Despite this apparent shifting of the burden of proof, that burden remains with the plaintiff at all times. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The analysis laid out in *McDonnell–Douglas* and *Burdine* has been followed by the Minnesota courts in deciding cases under the Minnesota Human Rights Act (MHRA), Minn.Stat. § 363.071 et seq. (1986). *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 623–24 (Minn.1988); *Danz v. Jones*, 263 N.W.2d 395, 399 (Minn. 1978).

■ Neither party seems to dispute that Kolstad made out a prima facie case or that Fairway articulated a legitimate nondiscriminatory reason. Therefore, Kolstad must show that Fairway's proffered reason for the letter requiring resignation or probation to be other than the true motivation for the employer's decision. This must be done by persuading a court that a discriminatory reason was more likely to have motivated the employer, or showing the rea-

son articulated by the employer to be unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

█ The ALJ found Fairway's articulation to be pretext based on several factors:

(1) *Comparison with a male employee less severely disciplined:* This comparison was relevant because the harm to the employer from an absent employee was at least as great as that caused by an employee with alleged "attitudinal" problems. We distinguish this case from *Shockency v. Jefferson Lines,* 439 N.W.2d 715, 720 (Minn.1989), in which a comparison between discipline of the black plaintiff and a white employee was held to be inadequate, *by itself,* to show pretext, especially where two white employees were fired for the same reason as the plaintiff. *Id.*

Kolstad received no warnings about poor performance affecting her job tenure prior to the letter requiring resignation or probation; on the contrary, she was repeatedly told that she was doing a good job. Thus, there was evidence to support the ALJ's finding that Kolstad was "surprised" to receive the letter and that she had no intention of actually quitting.

The federal cases relied upon by Fairway involve comparisons of employee actions that differed much more in degree and kind than in the instant case. *See Jenkins v. Louisiana,* 874 F.2d 992, 997 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 871, 107 L.Ed.2d 955 (1990) (comparing firing of black employee for falsification of doctor's expenses with white employees reprimanded for less serious infractions); *O'Connor v. Peru State College,* 781 F.2d 632, 636 (8th Cir.1986) (comparing male coaches who were tardy with female plaintiff who left her teams unsupervised, failed to notify her teams of her absences, was a poor recruiter and had poor working relations with other staff); *Box v. A & P Tea Co.,* 772 F.2d 1372, 1379 (7th Cir.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986) (comparing female cashier fired for cash shortage after several prior warnings with a male in a different job category); *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.1980),

*cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980) (comparing black plaintiff fired for knifing a co-worker with white employee reprimanded for shouting at another employee); *Kendrick v. Commission of Zoological Subdistrict,* 565 F.2d 524, 527 (8th Cir.1977) (comparing fired black plaintiff who severely beat up a co-worker with white employee reprimanded for delivering one "mild" blow to a co-worker).

(2) *Fairway's policy of not posting management-level positions:* Fairway correctly asserts that this factor, while relevant to possible discrimination in promotions, is not relevant to Kolstad's claim of discrimination related to her being required to resign or accept probation. *See Box v. A & P Tea Co.,* 772 F.2d at 1379.

(3) *Presentation by Fairway solely of management witnesses while Kolstad called management and non-management witnesses:* Fairway relies upon federal cases to argue that this factor is not tenable to support a finding of pretext. Our review shows that these cases merely state that this factor, *by itself,* is insufficient to show pretext. *See Phipps v. Gary Drilling Co.,* 722 F.Supp. 615, 620 (E.D. Cal.1989); *Murre v. A.B. Dick Co.,* 625 F.Supp. 158, 165 (N.D.Ill.1985); *Franklin v. Greenwood Mills Marketing Co., Division of Greenwood Mills, Inc., Co.,* 33 BNA Cas. 1847, 1855 (S.D.N.Y.1983). The co-workers' testimony was clearly relevant to whether Fairway's stated reasons were "worthy of credence;" it corroborated Kolstad's testimony as to her competence and that of the managerial employee who testified on her behalf, while contradicting the employer's version. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

(4) *Fairway's past practice of relocation, not termination:* Fairway does not dispute this as a basis for the finding of pretext. There was evidence in the record showing that Fairway had relocated at least one salaried employee who was not working out well in the warehouse.

We conclude there was ample evidence to support the ALJ's finding that Fairway's letter to Kolstad presenting her with the option of 30 days' probation with no guar-

antee of tenure or immediate resignation was discrimination based on her gender.

## II

The three-step analysis of *McDonnell–Douglas* applies to wage-discrimination claims. *Danz,* 263 N.W.2d at 398–99. A prima facie case is shown by proof of "an employer paying different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skills, effort and responsibility * * *." *Id.* at 399–400 (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (Equal Pay Act case)). Differences in wages are not unlawful in Minnesota if based on a seniority system, a merit system, à system which measures earnings by quantity or quality of production, or a wage differential based on any factor other than sex. 29 U.S.C. § 206(d)(1); Minn.Stat. § 181.67, subd. 1 (1988). Proof of one of these systems rebuts Kolstad's prima facie case, forcing her to show pretext.

A prima facie case was shown. Kolstad's male successor was paid $19,500 per year, $2,500 more than Kolstad, for the same job. Testimony in the record supports the ALJ's finding that the tasks performed by Kolstad and her successor were substantially the same. The official job title is not determinative; rather, "actual job requirements and performance" control. *Danz,* 263 N.W.2d at 400 (quoting 29 C.F.R. 800.121).

Fairway cites *Bowen v. Superwood Corp.,* 395 N.W.2d 738, 742 (Minn.App. 1986), *pet. for rev. denied* (Minn. Jan. 2, 1987), for the proposition that an employee's own testimony as to assumption of similar duties by a higher-paid male employee did not make out a prima facie case of wage discrimination. *Id.* A jury chose to disbelieve that employee and found she had not assumed the same duties for lower wages. That credibility determination was merely upheld by this court. *Id.* Fairway's argument misstates the law of the *Bowen* case.

Fairway does not argue that Kolstad did not assume Mittag's duties, nor that those duties were not performed by her successor after she left.

Fairway asserts that the $2,500 differential was justified by Kolstad's male successor's college education. However, the college degree was not required for the job; Mittag, Kolstad's predecessor, did not possess one. A college education could be relevant only if it is shown that the degree more fully qualified someone to do the job. *Cf. White v. Vathally,* 732 F.2d 1037, 1041 (1st Cir.1984), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). There was no such evidence before the ALJ.

Fairway also notes that Kolstad's male successor had 21 months of supervisory experience in a furniture factory and that Kolstad had six months' supervisory experience before performing the tasks her successor eventually assumed. They claim that this qualified him for a higher starting salary. The case relied upon by Fairway for this argument involved the existence of a bona fide merit system, which did not exist here. *See Marshall v. Aetna Insurance Co.,* 487 F.Supp. 717, 725 (E.D.VA 1978), *affirmed, EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 726 (4th Cir.1980).

The ALJ's finding of wage discrimination was based not only on evidence of the $2,500 disparity noted above, but also on evidence of the wages paid Pat Nutt, the only female on the management team, and those paid Luverne Young, another supervisor. Nutt was paid annually $4,000 to $11,000 less than any of the other managers, and Young, having worked for Fairway many more years than Mittag, earned $4,000 less than he for equal work.

## III

A. *Actual Compensatory Damages:* We hold there was substantial evidence in the record to support the ALJ's award of back pay due Kolstad. This award includes a 20 percent promotional raise she would have received at the end of one year of service, plus two five-percent annual merit increases. These increases would have raised her salary to $21,450

and $22,525 in 1987–88 and 1988–89, respectively. The ALJ erred in calculating that Kolstad's salary would have risen to $23,595 the last year, a $1,070 error. Thus, the damages due Kolstad should be modified by $1,070. The actual compensatory damage award is affirmed as modified.

There was ample evidence in the record to support the ALJ's finding that Kolstad was eligible for the promotion and for annual merit raises. The overall satisfactory job evaluations she received from her immediate supervisor and the testimony of another management employee that such raises were contemplated for her by management support that finding.

Kolstad contends that her compensatory damage award should have been trebled. However, since Kolstad failed to file a writ of certiorari or a notice of review asking us to consider this issue, we do not reach the merits of it.

(B) *Vocational Damages:* Fairway's own expert testified that Kolstad would be eligible for a list of jobs, equivalent in salary to her former job at Fairway, if she were given 30–90 days of vocational training. Such an award is appropriate only in cases where there is actual injury. *Memphis Community School District v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). Having held that the ALJ did not err in finding that Kolstad met her burden of proving discrimination, both in treatment and compensation, we hold there was actual injury shown and that the award of $4,875 was based on the evidence.

(C) *Mental Suffering:* Kolstad requested $14,000 in mental suffering damages; the ALJ awarded only $1,000. The ALJ did not abuse her discretion in discounting Fairway's expert's testimony that he could not attribute any of Kolstad's mild depression to her treatment by and departure from Fairway. Instead, the ALJ relied on Kolstad's expert, who did attribute some of her depression to her treatment by Fairway.

(D) *Punitive Damages and Civil Penalty:* Fairway argues that if this court reverses even some of the ALJ's findings on the merits, a remand would be in order on punitive damages and the civil penalty imposed. As we affirm the ALJ's findings on the merits, we also affirm the findings on punitive damages and the civil penalty imposed.

## IV

In *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 628 (Minn.1988), the Minnesota Supreme Court discussed the granting of attorney fees in an employment discrimination case in which the trial court's award of $60,000 in fees was only a few hundred dollars less than the plaintiff's recovery. *Id.* at 628. The supreme court remanded for findings as to why the attorney hours claimed were reasonable. *Id.* at 630. An award of attorney fees in employment discrimination cases is to be computed by determining the "lodestar" figure, which is calculated by "multiplying the 'number of hours reasonably expended on the litigation * * * by a reasonable hourly rate.'" *Id.* at 628 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)).

We do not believe that *Anderson* requires modification of the ALJ's award. The attorney fee award of $15,636 was significantly less than the $23,394 in damages awarded to Kolstad. (This was corrected above by subtracting $1,070, leaving an award of $22,324). Fairway asserts that this court should remand for a reduction in the award of fees if this court reverses on any of Kolstad's claims, citing *Anderson* at 630, but we do not reverse on any of her claims. The ALJ thoroughly discussed the issue of attorney fees and made it clear that she had evaluated the request with care, finding the requested fees reasonable.

As is true in many discrimination cases, this case was complex, it was difficult to obtain sufficient proof to show pretext, and it was hard to adduce proof justifying significant sums of compensatory damages. As a result, the fees awarded appear large in proportion to the plaintiff's recovery. Thus, it is incumbent upon the fact-finder

to examine carefully the efforts of plaintiff's counsel, the appropriateness of hours spent and the hourly rate requested.

The ALJ observed the work done by Kolstad's attorneys directly, the hourly rate is modest, and the findings on the issue are sufficiently specific to justify the fees awarded.

Kolstad petitioned this court for attorney fees upon appeal. We grant that request. Because only an informal bill was submitted, it is necessary that Kolstad's counsel file an affidavit with this court describing the services performed, the number of hours reasonably expended, the hourly rate, and a brief description of attorneys' experience and qualifications relative to the hourly rate requested. This affidavit should be submitted within ten days of receipt of this opinion, with a copy to appellant. Fairway, in turn, has ten days to respond to the affidavit if desired.

## DECISION

The ALJ did not err in finding that Fairway Foods discriminated against Laurie Kolstad in violation of Minn.Stat. § 363.03, subd. 1(2), in her compensation and when it required an immediate resignation or that she accept 30 days' probation. There was substantial evidence to support the ALJ's award of damages and the civil penalty. An arithmetic recalculation requires a reduction of compensatory damages by $1,070. The ALJ did not abuse her discretion in awarding Kolstad attorney fees on trial. Reasonable attorney fees will be ordered for respondent on this appeal.

Affirmed as modified.