Carol A. GERACI, Appellant,

v.

ECKANKAR, a California nonprofit corporation, Respondent.

No. CX–94–1506.

Court of Appeals of Minnesota.

Jan. 17, 1995.

Review Denied March 14, 1995.

David J. Duddleston, Thomas E. Marshall, Mackall, Crounse & Moore, PLC, Minneapolis, for appellant.

Dayle Nolan, Larkin, Hoffman, Daly & Lindgren, Bloomington, for respondent.

Considered and decided by RANDALL, P.J., SCHUMACHER and EDWARD D. MULALLY,* JJ.

## OPINION

SCHUMACHER, Judge.

Carol A. Geraci appeals from the partial summary judgment, arguing that the district court erred in (1) granting summary judgment on her terms and conditions gender discrimination claim, defamation claim, and promissory estoppel claim because there were genuine issues of material fact; (2) concluding that the First Amendment of the United States Constitution and Article I, Section 16 of the Minnesota Constitution insulates a religious employer from discharge-based claims brought by a non-minister; and (3) refusing to allow her to discover evidence of pretext for her discharge-based claims. We affirm.

## FACTS

Respondent Eckankar, a California non-profit corporation, is an hierarchial church and religion. It has subordinate churches in 48 states and numerous local groups throughout the world. Its headquarters are in New Hope and the Temple of ECK is in Chanhassen. ECKists believe:

> The universes of the SUGMAD are complete with a hierarchy of highly evolved

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

beings who govern all the worlds according to the laws of their own worlds. * * * IT rules singularly and by divine nature. There are no democratic principles found here.

Paul Twitchell, The Shariyat–Ki–Sugmad, Book One 35 (1987).

The laws and rules for the ECK chela are simple. These are to give harmony, purity, and perfection of the Soul.

*Id.* at 100.

Carol Geraci is a 1986 cum laude graduate from City University of New York with a degree in computer science. She became a member of Eckankar in 1986 and a second initiate in May 1989. Shortly thereafter, she applied for a job and was hired as a systems analyst at Eckankar's headquarters. She then moved from New York to Minnesota. The $22,000 per year position included helping install a computer system.

Shortly before hiring Geraci, Eckankar hired another systems analyst, David Tillery. Tillery graduated from the University of Delaware in 1975. After college, he primarily programmed mainframe computers. He also had experience in supervising employees and administering systems. Tillery became systems administrator of the network and immediately had complete access to the network. Geraci was not given complete access until she had worked for Eckankar for 11 months. When Geraci asked to learn the new network, her supervisor, Eric Wollan, told her to read the manuals on her own time. Tillery was paid $25,000 annually.

Geraci discussed her situation with the president and board members of Eckankar. On June 21, 1991, Geraci notified Eckankar's spiritual leader and board members of her complaints and alleged legal violations. On July 9, 1991, Geraci was placed on a leave of absence by Eckankar's director of spiritual services and warned that if she persisted in trying to impose her feelings on the spiritual direction of Eckankar, she would be suspended or excommunicated. In August, Geraci's membership was terminated because of her disregard of the sacred teachings of Eckankar as manifested by her failure to work in harmony with her co-workers. Church membership was a prerequisite for employment at Eckankar's headquarters. Because Geraci was no longer a member, she was terminated.

Geraci sued, alleging statutory sex discrimination and reprisal claims, as well as common law claims for defamation, promissory estoppel, and intentional infliction of emotional distress. The district court eventually granted summary judgment on all claims, except for a defamation claim relating to a co-worker calling her insubordinate. Claims involving Geraci's suspension from membership and dismissal, including Count I (gender discrimination), Count II (reprisal), and Count V (intentional infliction of emotional distress), were dismissed under the Establishment Clause of the United States Constitution and the Minnesota Constitution because analyzing the pretext question would cause excessive entanglement and excessively burden Eckankar's exercise of its religious beliefs. Count I involving gender discrimination in the terms and conditions of employment was dismissed because the court found that Geraci failed to present a fact question on the pretext prong of the *McDonnell–Douglas* test. Count III (defamation) was dismissed because the statements were opinions and were not actionable. Finally, Count IV (promissory estoppel) was dismissed because the "promise" was not clear and definite and therefore not actionable as a matter of law. The district court found there was no just reason for delay, and Geraci appealed.

## ISSUES

1. Did the district court err in concluding that Geraci failed to present sufficient evidence to raise a material issue of genuine fact as to whether Eckankar's proffered business reasons were a pretext for discrimination?

2. Did the district court err in concluding that the complained of statements were not defamatory?

3. Did the district court err in concluding that Geraci's claim for promissory estoppel failed because the promise was not definite and clear?

4. Does the Minnesota Constitution bar judicial review of Geraci's discharge-based claims?

5. Does the Establishment Clause bar judicial review of Geraci's discharge-based claims?

6. Did the district court err in applying the *Smith* test when analyzing Eckankar's Free Exercise clause defense?

## ANALYSIS

On appeal from summary judgment, we determine whether there are any issues of material fact and whether the district court correctly applied the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn. 1990). Geraci argues that summary judgment was improper on her terms and conditions of employment discrimination claim, her promissory estoppel claim, and her defamation claims because there were material issues of fact.

1. Under Minnesota law, it is an unfair employment practice for an employee to discriminate with respect to terms or conditions of employment on the basis of sex except when based on a bona fide occupational qualification. Minn.Stat. § 363.03, subd. 1(2)(c) (1992). For indirect discrimination claims, Minnesota has adopted the three-part *McDonnell–Douglas* test. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 719–21 (Minn. 1986). Under this test, an employee must present a prima facie case of discrimination; the burden of persuasion then shifts to the employer to present a legitimate nondiscriminatory reason for its actions; and the burden then returns to the employee to show that the employer's justification is a pretext for discrimination. *Id.* at 720.

The district court found that Geraci presented a prima facie case of gender discrimination with regard to her terms and conditions of employment because she was a member of a protected group; she was qualified; but despite her qualifications, she was paid less and given less access to the computer system than her male counterpart. Eckankar acknowledged that Tillery was paid more than Geraci, but stated that he was given different assignments and received complete access to the computer system before Geraci because he had more experience in network administration and supervising employees. The court found that Geraci was unable "to show a pattern of salary or job duty inequality based on gender" and did not offer "sufficient evidence to establish the existence of a genuine issue of material fact on the question of pretext."

On appeal, Geraci claims that she set forth sufficient probative evidence on the issue of pretext to defeat the summary judgment motion, including the facts that Tillery was not more qualified nor had greater responsibilities than Geraci, and Dorothy Laurence, an Eckankar employee, was paid less than the four males she supervised. We disagree.

The fact that one female manager, in a 70-person organization, was paid less than the males she supervised is not sufficient to present a fact question on the issue of pretext, especially when there was a business reason why she was paid less: it was a temporary position. Moreover, Geraci's male replacement was paid less than she, commensurate with his experience. In addition, while Geraci and Tillery were hired at the same level on the organizational chart, Tillery had significant experience in systems administration; Geraci had none. Thus, it appears this was a legitimate business decision to give Tillery more responsibility and pay him $3,000 more than Geraci. We note that Geraci and Tillery did not supervise other employees. Tillery, however, worked with others while supervising projects; therefore, it was not improper to take into account Tillery's prior supervisory experience.

By notice of review, Eckankar contends that judicial review of this claim was improper on constitutional grounds because the context of Geraci's employment was pervasively religious. We disagree. If an employee's claims may be resolved by relying on neutral methods of proof, the religion clauses do not prevent review. *Black v. Snyder,* 471 N.W.2d 715, 720 (Minn.App.1991) (citing *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1360–61 (D.C.Cir.1990)), *pet. for rev.*

*denied* (Minn. Aug. 29, 1991). Geraci's claims were based on disparity in pay, job duties, and access to the computer system. Eckankar did not allege that the disparity was based on religious reasons, but because of Tillery's superior experience. Because inquiry into these issues did not involve ecclesiastical matters, judicial review was proper.

■ 2. A statement is defamatory if it (1) has been communicated to a third party; (2) is false; and (3) tends to harm the individual's reputation and lowers him or her in the community's estimation. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980). Before 1990, some federal circuit courts held that statements of opinion were absolutely protected from defamation suits under the First Amendment. *Huyen v. Driscoll,* 479 N.W.2d 76, 79–80 (Minn.App. 1991) (citing *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Ollman v. Evans,* 750 F.2d 970, 975 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985)), *pet. for rev. denied* (Minn. Feb. 10, 1992). In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court made clear that not all opinions were protected and that the distinction between fact and opinion employed by the lower courts was artificial. *Id.* at 18–21, 110 S.Ct. at 2705–07. The Court held that only statements about matters of public concern not capable of being proven true or false and statements that cannot be interpreted reasonably as stating facts are protected from defamation actions under the First Amendment. *Id.; see also McGrath v. TCF Bank Sav.,* 502 N.W.2d 801, 808 (Minn.App.1993), *aff'd as modified,* 509 N.W.2d 365 (Minn. 1993). This court has stated, however, that the pre-*Milkovich* test and case law are still instructive to determine if a statement is actionable pursuant to *Milkovich. McGrath,* 502 N.W.2d at 808; *Huyen,* 479 N.W.2d at 80. The four-factor test examines the statement's (1) specificity and precision, (2) verifiability, (3) literary and social context in which it was made, and (4) public context. *McGrath,* 502 N.W.2d at 808. Whether a statement can be interpreted as stating facts

or can be proven false is a question of law. *Id.*

■ Here, the district court found that a statement by Tillery to an unidentified job candidate that an employee [Geraci] was not "technically strong" was not actionable because Tillery did not refer to Geraci by name. There is no indication in the record that the job candidate knew Geraci or knew that Geraci worked for Eckankar. Thus, the statement was not defamatory because Geraci's reputation in the community could not have been affected. *See Stuempges,* 297 N.W.2d at 255.

Next, the district court found that the statement that Geraci did not "have the technical expertise to work on that, or to do something" was not defamatory because without the context of the alleged lack of technical expertise there could be no harm to Geraci's reputation. The record does not provide the underlying facts of this statement. It is possible that Geraci did not have the technical expertise to work on "it" and thus the statement is not actionable because it is true. *See Stuempges,* 297 N.W.2d at 255. Moreover, Geraci's reputation cannot be injured if no one can tell from the statement in what area Geraci is lacking technical expertise. *See id.*

■ Finally, the district court found that the statements that Geraci "had poisoned the board," was "out of control," "a bad influence," "emotional," and "not a team player" were published and would tend to lower her reputation in the community. The court concluded, however, that these claims were not actionable because they do not contain facts or factual connotations that can be proven false.

■ Geraci argues that the court should have used the four prong test and that these statements would harm her reputation. A district court need not use the four prong test; it is only a tool. *See Huyen,* 479 N.W.2d at 80. In addition, the issue is not whether the statements would harm her reputation, but whether the statements are not subject to a defamation claim because of the First Amendment's protection of free speech. These statements were not of public interest.

*Cf. Hunt v. University of Minn.,* 465 N.W.2d 88, 94 (Minn.App.1991) (qualifications of public employee is of public interest). Second, the statements could not reasonably be interpreted as stating facts. *See, e.g., McGrath,* 502 N.W.2d at 808 ("troublemaker" not actionable); *Huyen,* 479 N.W.2d at 80 (statements referring to "insufficient level of accountability," "uneven use of authority," "unwillingness to participate" not actionable); *Lund v. Chicago & Northwestern Transp. Co.,* 467 N.W.2d 366, 368–69 (Minn.App.1991) ("favoritism," "move-ups," "brown nose" not actionable), *pet. for rev. denied* (Minn. June 19, 1991); *Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 821 (Minn.App. 1988) ("fluffy," "b-tch," flirtatious not actionable). *But see Weissman v. Sri Lanka Curry House, Inc.,* 469 N.W.2d 471, 473 (Minn. App.1991) ("dishonest" actionable).

Geraci argues that other allegedly defamatory statements were not considered by the district court. These statements, however, were not presented to the district court in Geraci's response to Eckankar's motion for summary judgment. An appellate court's scope of review is limited to issues considered and decided by the trial court. *Krueger v. State Farm Fire & Casualty Co.,* 510 N.W.2d 204, 209 (Minn.App.1993). Because these statements were not presented to or decided by the district court, we decline review.

3. Next, Geraci argues that Eckankar's request for a two-year time commitment from Geraci implied a reciprocal promise that Eckankar must employ Geraci for a minimum of two years. Geraci cites no precedent for her theory and we decline to adopt it.

[A] promise which is expected to induce definite action by the promisee, and does induce the action, is binding if injustice can be avoided only by enforcing the promise.

*Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn.1992) (citing Restatement (Second) of Contracts § 90(1) (1981)). The promise must be definite and clear. *Id.* The district court determined that there was no "clear and definite promise to provide employment for two years." We conclude summary judgment was appropriate because the court correctly applied the law and there were no material issues of fact.

4. The district court found that Geraci offered sufficient evidence to establish the existence of a genuine issue of material fact regarding the merits of her discharge-based claims and whether her excommunication was a pretext for her discharge. The court, however, ruled that inquiry into Eckankar's proffered reasons for termination, that is, her excommunication, was impermissible under the United States and Minnesota Constitutions.

The Minnesota Constitution provides:

The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.

Minn.Const. art. I, § 16. The freedom of conscience clause has a four-prong test: (1) whether the objector's belief is sincerely held; (2) whether the regulation burdens the exercise of religious beliefs; (3) whether the state's interest in regulations is compelling; and (4) whether the state regulation uses the least restrictive means. *Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.,* 487 N.W.2d 857, 865 (Minn.1992).

The Minnesota Constitution affords greater protection of religious freedom than the United States Constitution. *State v. Hershberger,* 462 N.W.2d 393, 397 (Minn. 1990).[1] The First Amendment limits the government from prohibiting the exercise of

---

1. At the time *Hershberger* was decided, the Supreme Court used the *Smith* test when analyzing free exercise issues. *Hershberger,* 462 N.W.2d at 396.

religion. Section 16, however, precludes even "an infringement on or an interference with religious freedom." *Id.* Government actions that do not prohibit religious practices could still violate the Minnesota Constitution if they interfere with those religious practices. *Id.* Moreover, the Constitution prohibits the judiciary, as well as the legislature, from violating free exercise rights. *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 1038, 4 L.Ed.2d 1140 (1960).

Geraci does not dispute that Eckankar's religious beliefs are sincerely held, but contends that application of the Minnesota Human Rights Act to Eckankar does not excessively burden Eckankar's religious beliefs. Geraci, relying on *Hill–Murray,* argues that application "may affect how Eckankar treats its employees, but it does not affect its religious belief." We disagree.

We begin by recognizing that the Minnesota Human Rights Act (Act) has been held constitutional on its face and as applied to private companies whose owners held strict religious beliefs. *State by McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 854 (Minn.1985); *State by Johnson v. Porter Farms, Inc.,* 382 N.W.2d 543, 548 (Minn.App. 1986). Those cases did not involve an application of the Act to a church and are not controlling. In addition, the Act exempts a religious organization with respect to religious qualifications when religion is a bona fide occupational qualification.[2] Minn.Stat. § 363.02, subd. 1(2) (1992). Geraci has not brought a claim for religious discrimination. Thus, the issue is not whether Eckankar permissibly or impermissibly discriminated against Geraci on the basis of religion, but whether the court can resolve whether Eckankar discriminated against Geraci on the basis of gender or whether there was reprisal without violating Eckankar's First Amendment right to the free exercise of religion. We hold we cannot.

Eradication of discrimination is a compelling state interest. *Sports & Health Club,* 370 N.W.2d at 854. There is no objection

that Eckankar's beliefs are sincerely held. Further application of the Act to Eckankar, however, would excessively burden its religious beliefs. In *Hill–Murray,* the Minnesota Supreme Court concluded that application of the Labor Relations Act to lay employees of a parochial school would not violate the First Amendment because the terms and conditions of employment were "not doctrinally related and [were] negotiable." 487 N.W.2d at 866. The court also found that Hill–Murray still had the power "to require compliance with religious doctrine" and could "remove any person who fail[ed] to follow the religious standards." *Id.* Here, Eckankar claims it discharged Geraci because she was no longer a member. Further litigation of Geraci's claims would require a court to question Eckankar's monitoring of Geraci's adherence to church doctrine, its reasons for excommunication, and the veracity of Eckankar's responses. On such matters, "the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985) (citing *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 720, 96 S.Ct. 2372, 2385, 49 L.Ed.2d 151 (1976)), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). If courts begin to question a church's basis for doctrinal decisions, a church may be compelled to conform its religious beliefs with the government's or the majority culture's beliefs. *See Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952) (religious organizations should be free from "secular control or manipulation"); *see also* Frederick M. Gedicks, Toward a Constitutional Jurisprudence of Religious Group Rights, 1989 Wisc.L.Rev. 99, 111–12 (explaining Mormons' abandonment of polygamy due to government interference). There is a tension between eradicating discrimination and permitting the free exercise of religion; however, in this case, the balance weighs in favor of the First Amendment.

*Bishop v. Amos,* 483 U.S. 327, 338, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987).

2. The Supreme Court has held that such a religious based exemption does not violate the Establishment Clause. *Corporation of the Presiding*

5. The Establishment Clause prohibits law-making "respecting an establishment of religion." U.S. Const. amend. I. The district court held that Geraci's discharge-based claims were barred under the Establishment Clause because judicial review would constitute excessive entanglement. Geraci contends that the district court erred in applying this clause to prevent review of her claims, arguing that the clause only bars review of employment decisions involving ministers and clergy. Eckankar responds that courts must abstain from exercising jurisdiction over any claims involving church doctrine, faith, or discipline whether or not they involve a member of the clergy.

First, Geraci's reliance on the "minister" exception to Title VII is misplaced. The fifth circuit was the first court to recognize this exception. *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). The *McClure* court found that applying Title VII to the employment of ministers would violate the *free exercise* clause. *Id.* at 560. The court expressly refrained from addressing a church-non-minister relationship. *Id.* at 555. Later cases made attempts to determine whether there was a church-minister relationship in order to apply the bright-line rule. *See, e.g., Rayburn*, 772 F.2d at 1168 (*McClure* exception not dependent upon ordination, but upon function of position); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 285 (5th Cir.1981) (ordained ministers working as support personnel in seminary do not fall under *McClure* exception thus EEOC regulations apply). We conclude that *McClure* and its progeny do not dispose of this case because it is only a narrow exemption to Title VII in order to accommodate religious employers' free exercise rights.

Second, we note that the district court and both parties applied the *Lemon* test. We question *Lemon's* continuing vitality subsequent to the Supreme Court's decision in *Board of Educ. v. Grumet*, —— U.S. ——, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), where the court did not rely on *Lemon*, but used neutrality principles when analyzing the Establishment Clause. *See id.*, —— U.S. at ——,

114 S.Ct. at 2515 (Scalia, J., dissenting) (noting Court's "snub of *Lemon*"). We conclude, however, that under either type of analysis the courts may not review Geraci's discharge-based claims.

■■■ Under the *Lemon* test, the government action must: (1) have a secular purpose; (2) neither inhibit nor advance religion as its primary effect; and (3) not create excessive entanglement between church and state. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Under *Grumet*, governmental power must be exercised in a religiously neutral manner. —— U.S. at ——, 114 S.Ct. at 2491.

■■■ The parties agree that the Minnesota Human Rights Act has a secular purpose and that its primary effect is not to inhibit religion. The question is whether there is excessive entanglement or whether the governmental action is religiously neutral. Whether governmental action causes excessive entanglement depends on the nature of the intrusion into religious administration, the character and purpose of the involved institutions, and the resulting relationship between the religious authority and the government. *Lemon*, 403 U.S. at 614–15, 91 S.Ct. at 2112.

The Minnesota Supreme Court has held that the First Amendment does not bar the application of Title VII to private businesses whose owners hold sincere religious beliefs. *Sports & Health Club*, 370 N.W.2d at 854; *Porter Farms*, 382 N.W.2d at 548. Here, however, the institution involved is a church and the governmental action intrudes into the administration of that church. Accordingly, *Sports & Health Club* and *Porter Farms* are not dispositive.

■■■ If claims involve core issues of ecclesiastical concern, government entanglement prevents judicial review. *Serbian Orthodox Diocese*, 426 U.S. at 721–23, 96 S.Ct. at 2386–87; *Minker*, 894 F.2d at 1360; *Black*, 471 N.W.2d at 720. If the dispute, however, can be resolved on neutral methods of proof, judicial review is permissible. *Minker*, 894 F.2d at 1360, *Black*, 471 N.W.2d at 720.

The district court found that Geraci "does not dispute the fact that her membership in Eckankar was a condition of her employment." Eckankar claims that, because church membership is a requirement of employment, it terminated Geraci because she was excommunicated. The parties were unable and we cannot devise a way to determine if this reason for termination was a pretext for discrimination without questioning the reasons for the excommunication and the veracity of those reasons. *See Minker*, 894 F.2d at 1360–61 (inquiry into church's reasons for rejecting person for pastorship, even for pretext, would cause entanglement). Such a searching inquiry is barred by the First Amendment.[3]

6. Geraci contends that the district court correctly concluded that the Free Exercise Clause did not bar review of her claims. Eckankar responds that the district court erroneously applied the *Smith* test, instead of the compelling interest test and that enforcement of Geraci's claims would excessively burden Eckankar's exercise of religious freedom.

In *Employment Div, Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the Free Exercise Clause does not bar the application of a neutral generally applicable state law that incidentally burdens the free exercise of religion. 494 U.S. at 878–79, 110 S.Ct. at 1600. Here, the district court applied the Smith test and determined that enforcement does not bar Eckankar's free exercise rights. Congress, however, passed the Religious Freedom Restoration Act of 1993, which restored the compelling interest test to the Free Exercise Clause. Pub.L. No. 103–141, 107 Stat. 1488 (1993) (codified as 42 U.S.C. § 2000bb). The legislation applies to all federal and state laws and is retroactive. *Id.; see also Brown–El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994) (Act applies retroactively). Generally, a court is required to apply the law that is in effect at the time it renders its decision. *McClelland v. McClelland*, 393 N.W.2d 224, 226–27 (Minn.App.1986), *pet. for rev. denied* (Minn. Nov. 17, 1986). Here, the district court should have applied the compelling interest test. Because we conclude that Geraci's discharge-based claims are barred by the Establishment Clause and Minnesota's Freedom of Conscience Clause, however, the issue is moot.

Geraci argues that the court erred in restricting discovery on issues of pretext. Because we determined that the district court correctly determined that judicial review of the discharge-based claims was constitutionally barred, we likewise conclude the court did not abuse its discretion in restricting discovery once those claims were dismissed. Because we rule in Eckankar's favor, we do not address its freedom of expression and association claim.

### DECISION

The district court correctly dismissed Geraci's terms and conditions of employment, defamation, and promissory estoppel claims because there were no genuine issues of material fact and the court correctly applied the law. The district court properly dismissed Geraci's discharge-based claims because judicial review was forbidden by the United States and Minnesota Constitutions.

**Affirmed.**

RANDALL, Judge, concurring specially.

I concur in the result, but conclude that Carol Geraci did not even make a prima facie showing of employment discrimination under

---

3. In *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, a parochial school would not renew a pregnant teacher's employment contract allegedly because, under its religious doctrines, mothers should stay home with preschool age children. 477 U.S. 619, 623, 106 S.Ct. 2718, 2720–21, 91 L.Ed.2d 512 (1986). The teacher then threatened to bring a discrimination claim. Dayton rescinded its nonrenewal decision, but fired the teacher because she did not resolve her dispute internally as mandated by church doc-trine. *Id.* The United States Supreme Court held that a state agency may exercise jurisdiction over the claim and preliminarily investigate "the circumstances of [the teacher's] discharge * * *, if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge" without violating Dayton's First investigation. Moreover, the Court stated that Dayton will no doubt "receive an adequate opportunity to raise its constitutional claims" either at the administrative level or in state court. *Id.*

*McDonnell–Douglas.* The undisputed facts show only that the employer had legitimate non-discriminatory reasons for its decisions. I find no issues of material fact supporting a prima facie case.

To establish a prima facie case of discrimination, the plaintiff must present proof of discriminatory motive. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) ("A prima facie case may be established by direct evidence of discriminatory motive"). Where the plaintiff cannot produce such direct evidence, the plaintiff may still present a prima facie case by showing that: (1) plaintiff is a member of a protected group; (2) plaintiff sought and qualified for opportunities that the employer made available to others; (3) despite being qualified, plaintiff was denied these opportunities; and (4) after plaintiff was denied, the opportunities remained available or were given to other persons with plaintiff's qualifications. *Id.* For wage discrimination claims, the plaintiff must show that the employer paid different wages to employees of opposite sexes for equal work on jobs requiring equal skills, effort, and responsibility. *Kolstad v. Fairway Foods, Inc.,* 457 N.W.2d 728, 734 (Minn.App.1990).

Here, the record shows Tillery, who was given opportunities Geraci was not, was qualified in ways that Geraci was not. Tillery had approximately eleven years experience in computer systems analysis, programming mainframe computers, supervising employees, and computer network administration. When Geraci was hired, she had recently graduated from college, had some experience in computer design and programming, but had no experience in computer network administration. After Geraci's termination, her male replacement was given some responsibilities formerly performed by Tillery and Geraci, and paid *substantially* less than Geraci because he had even less experience.

Geraci had to show that she sought and was qualified for opportunities that the employer was making available to others. *See Sigurdson,* 386 N.W.2d at 720. Tillery had experience maintaining computer networks and was qualified to administer the employer's computer network here. Geraci did not have experience administering computer networks. Further, Tillery's and Geraci's duties involved different skills and responsibilities. *See Kolstad,* 457 N.W.2d at 734. Tillery's additional responsibilities and slightly higher income were not surprising in view of his superior experience.

Rather than supporting a prima facie case of employment discrimination, the facts present exactly the type of factors employers and managers regularly and legitimately use in delegating authority and in setting employee salaries.