# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 11-1952

_____

Turkish Coalition of America,     \*
Inc.; Sinan Cingilli,     \*
    \*
       Appellants,     \*
    \*
       v.     \*     Appeal from the United States
    \*     District Court for the
Robert Bruininks, in his     \*     District of Minnesota.
individual capacity; Bruno     \*
Chaouat, in his individual     \*
capacity; University of Minnesota,     \*
    \*
       Appellees.     \*
    \*
------------------------------     \*
    \*
The Rutherford Institute,     \*
    \*
       Amicus on behalf of     \*
       Appellants,     \*
    \*
Carol L. Chomsky; Jennifer     \*
Green; Robert A. Stein, Dean;     \*
David Samuel Weissbrodt,     \*
Professors Concerned for     \*
Academic Freedom,     \*
    \*
       Amici on behalf of     \*
       Appellees.     \*

Submitted: February 14, 2012
Filed: May 3, 2012

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Sinan Cingilli, a student at the University of Minnesota, and Turkish Coalition of America, Inc. ("TCA"), a non-profit corporation that provides information about the nation of Turkey and Turkish-Americans, appeal the district court's dismissal of their respective First Amendment claims and TCA's state-law defamation claim for failure to state a claim. We affirm with respect to TCA's First Amendment and defamation claims. With respect to Cingilli's First Amendment claim, we vacate and remand for dismissal due to lack of standing.

## I.    Background

Defendant Professor Bruno Chaouat directs the Center for Holocaust and Genocide Studies ("Center") at the University of Minnesota. Prior to November 2010, the Center's website displayed a list of "Unreliable Websites." The preface to the list stated:

> We do not recommend these sites. Warnings should be given to students writing papers that they should not use these sites because of denial, support by an unknown organization, or contents that are a strange mix of fact and opinion. We also do not advise using sites with excessive advertising.

-2-

The "Unreliable Websites" list included websites disputing the factuality of the Nazi genocide of Jews during World War II and the Turkish genocide of Armenians during World War I. It mentioned no websites relating to other genocides, although it listed general internet reference sources such as Wikipedia and About.com. The first "Unreliable Website" on the list was that of TCA. In late 2008 or early 2009, TCA sent a letter to the university alleging that the inclusion of TCA's website, coupled with the warning to students, violated the First Amendment. The university responded in August 2009 that the listing was merely the Center's opinion and that students remained free to access the TCA website.

According to the Complaint, on November 5, 2010, Cingilli, then a freshman at the university, sought out Professor Chaouat and asked about using the TCA website "in conjunction with a research paper." Professor Chaouat "strongly discouraged" such use of the website and "repeatedly refused to deny that there would be academic consequences" for Cingilli if he did so. Cingilli was "afraid to use" the TCA website after this exchange. Notably, however, the Complaint does not suggest that Cingilli was enrolled in a class with Professor Chaouat or that the professor was otherwise in a position to affect Cingilli's grades or academic standing.

Following Cingilli's meeting with Professor Chaouat, TCA sent a demand letter to the university with a draft complaint attached. On November 18, 2010, the Center revised its website, removing the list of unreliable websites and offering "recommended" resources instead. The university sent a letter to TCA denying that the change was motivated by the demand letter and denying any wrongdoing. The letter also stated that the university would "not permit any kind of retaliation" against Cingilli and that all students "are evaluated based upon the quality of their academic work." Articles about the dispute appeared in two newspapers, and on November 24, Professor Chaouat posted a "Response to 'Unreliable Websites'" on the Center's website. The response stated that the "Unreliable Websites" list was removed

because Professor Chaouat did not want to "promote, even negatively, sources of illegitimate information."

A week later, TCA and Cingilli filed this suit alleging various constitutional claims and state-law defamation against the university, its president Robert Bruininks, and Professor Chaouat.[1] The district court dismissed all claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), holding that the doctrine of academic freedom protected the actions of all defendants and that the alleged defamatory statements were solely matters of opinion. The district court also stated that "it does not appear" that the requirements of Article III standing were satisfied, although it did not analyze the issue. TCA and Cingilli appeal only the dismissal of the First Amendment and defamation claims.

## II.     Standing

The district court erred in assuming without deciding that the requirements of standing were met, because "standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). In addressing standing, "the court must accept all factual allegations in the complaint as true and draw all inferences in the plaintiff's favor." *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005). Standing requires (1) an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury "be fairly traceable to the challenged action of the defendant," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a

---

[1]The Complaint sought damages on the constitutional claims against solely President Bruininks and Professor Chaouat in their individual capacities. *See Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) ("[T]he University of Minnesota is an instrumentality of the state and entitled to share in the state's Eleventh Amendment immunity.").

favorable decision." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 791-92 (8th Cir. 2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992)).

### A.    Cingilli

Cingilli makes no allegation that the defendants have taken any action to prevent him from accessing the TCA website at his will.  Instead, he alleges that he fears retaliation, in the form of lowered grades or other detriment to his academic standing, if he uses the website for a research paper.  He relies on the proposition that, in the context of a First Amendment claim, "actual injury can exist for standing purposes even if the plaintiff has not engaged in the prohibited expression as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences." *Id.* at 792.  His argument fails, however, because the Complaint does not allege that Professor Chaouat has any ability whatsoever to influence Cingilli's academic standing.

In his reply brief, Cingilli urges that, despite an absence of control over any of Cingilli's grades, Professor Chaouat might be able to affect his academic standing because "professors regularly communicate to one another about work-related issues, such as . . . troublesome students."  Even treating this generously as an inference one might draw from the Complaint, it is far too speculative to establish an *objectively reasonable* chilling effect.  *See Klobuchar*, 381 F.3d at 791-92.  As we noted in a similar situation, "Plaintiffs claim that they have thoroughly described why . . . the statute *could* be easily manipulated, and the *possible* motives police may have to [do so] . . . .  Even so, they fail in the key respect of asserting that peace officers *in fact* initiate retaliatory prosecution . . . ." *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009) (finding no standing for plaintiffs' First Amendment claims).  Likewise, in the instant case, there are no factual allegations that Professor Chaouat or other professors at the University of Minnesota in fact reach out to lower the grades of

"troublesome" students in classes taught by others. In the same fashion, while President Bruininks *conceivably* could intervene to lower Cingilli's grades or deny him other academic benefits, there is no allegation that he *in fact* engages in such practices. As a result, Cingilli has not "nudged [his] claims across the line from conceivable to plausible." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because Cingilli fails to plead facts sufficient to demonstrate an objectively reasonable chilling effect, he has not established standing to pursue a First Amendment claim under these circumstances.

   *B.*   *TCA*

TCA argues that it has standing to pursue a First Amendment claim because the labeling of its website as "unreliable," and the inclusion of it on the same list as websites denying the Holocaust perpetrated by the Nazis in World War II, stigmatized TCA. TCA relies on *Meese v. Keene*, 481 U.S. 465 (1987), in which a California attorney serving as a state senator wished to show Canadian films purporting to address the effects of nuclear war and acid rain. Because the films met the definition of "political propaganda" under the Foreign Agents Registration Act of 1938, however, the state senator feared damage to his public reputation as a "disseminator of foreign political propaganda." *Id.* at 467. He filed suit on First Amendment grounds to enjoin the application of the Act. The Court acknowledged that the Act did "not have a direct effect on the exercise of his First Amendment rights" because it did "not prevent him from obtaining or exhibiting the films." *Id.* at 473. Nevertheless, the Court found that he alleged a cognizable injury based on his allegation that "his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." *Id.*

Several courts have found that, under *Meese*, a non-profit organization that alleges an injury to reputation through stigmatizing government speech has Article III standing to bring a constitutional claim:

> The fact that an injury to the reputation of an organization such as SMHA can serve as a basis for standing has been recognized at least since *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) (plurality opinion). In that case, the Supreme Court stated that the effect of designating the complaining organizations as "Communist" was to "cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation." *Id.* at 139 (principal opinion) (Burton, J.); *see id.* at 140-41.

*S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 524 (D.C. Cir. 1977); *see also Riggs v. City of Albuquerque*, 916 F.2d 582, 583-85 (10th Cir. 1990) (holding that plaintiff "politically active organizations who, it was alleged, have often taken controversial and unpopular positions" pled a cognizable injury for standing purposes where they "allege[d] harm to their personal, political, and professional reputations in the community"). We agree that TCA similarly has pled a cognizable injury here. As a result, TCA has standing to pursue its First Amendment claim.

## III.    TCA's First Amendment Claim

Although it has standing, TCA nevertheless fails to state a First Amendment claim under Rule 12(b)(6). The grant of a motion to dismiss is reviewed *de novo*. *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 918 (8th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 570).

TCA contends that an advocacy organization's First Amendment right to express its ideas, as well as the First Amendment rights of others to receive those ideas, are violated when a state university professor opines that the organization's materials are unreliable and warns students that using those materials in a research paper will result in bad grades. To support its contention, TCA relies primarily upon three Supreme Court cases. Examining each of those three cases in turn, however, convinces us that the complained-of conduct, without more, does not rise to the level of a First Amendment violation.

First, TCA relies on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), in which secondary school students challenged a school board's removal of certain books from school libraries. In *Pico*, the Supreme Court, citing the "right to receive ideas," *id.* at 867, ruled that the First Amendment was violated if the school board members "*intended* by their removal decision to deny [students] access to ideas with which [the school board] disagreed, and if this intent was the decisive factor in [the] decision," *id.* at 871. TCA argues that, following *Pico*, they have stated a First Amendment claim with their allegation that the Center's intent in warning students about the TCA website was to deny access to ideas with which the Center disagreed.

The key distinction in *Pico* is that the books actually were *removed* from the libraries, substantially impairing the students' ability to access the ideas they contained. *See id.* at 866 ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965))). Here, in contrast, "the spectrum of available knowledge" for students at the university was unaffected. There is no allegation that the defendants impaired students' access to the TCA website on a university-provided internet system. There is no hint in the Complaint that university students were not free to, for example, read the TCA website, email material from the TCA website to their friends, regale passers-by on the sidewalk with quotes from the

-8-

TCA website, and so forth. In short, TCA's website was not "removed" from the university in any sense.

Second, TCA relies on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), in which book publishers challenged a state statute empowering the "Rhode Island Commission to Encourage Morality in Youth" to declare certain books to be "objectionable." *Id.* at 61. When the Commission identified an objectionable book, it notified the in-state wholesale distributor of the book that the Commission had a duty to recommend prosecution if the Commission viewed the book as obscene. *Id.* at 62. The Commission typically sent local police officers to inquire what actions the distributor took as a result of the notice. *Id.* at 63. Distributors subjected to this practice routinely decided to cease their distribution of the challenged book without waiting to see if prosecution was recommended. *Id.* at 63-64.

TCA contends that here, as in *Bantam Books*, while the state actor did not directly block access to the disfavored material, the state actor's actions chilled others into avoiding the materials. Importantly, however, the Court in *Bantam Books* found a violation of the First Amendment only because the government actor's "acts and practices directly and designedly stopped the circulation of publications in many parts of Rhode Island." *Id.* at 68. In other words, in 1963, if a book's wholesale distributor decided not to distribute it, it became physically unavailable. In contrast, as discussed above, there is no allegation that the challenged actions here made TCA's website unavailable to students at the university.

Finally, TCA contends that *Meese v. Keene* established the proposition that "[g]overnment aspersion on speech to cast suspicion on its credibility with an actual or potential audience is a cognizable First Amendment restriction." While the state senator in *Meese* successfully established standing, however, his First Amendment challenge failed on the merits because the Act did "not pose any obstacle to [his] access to the materials he wishes to exhibit." 481 U.S. at 480. Likewise, here there

-9-

is no obstacle to accessing any materials TCA wishes to exhibit on its website; there is merely an obstacle to citation of the material in students' research papers. Schoolwork submitted for grading is designed to please an audience of one—the grader—and TCA's attempt to cast this narrow restriction on re-use of its material as a universal ban on distribution is unsupportable. While the Center warned against that narrow type of re-use, it "place[d] no burden on protected expression" by TCA. *See id.*

In light of the absence of allegations that the challenged actions posed an obstacle to students' access to the materials on TCA's website or made those materials substantially unavailable at the university, the Rule 12(b)(6) dismissal of TCA's First Amendment claim must be affirmed.

## IV.     TCA's Defamation Claim

TCA alleges that the defendants defamed it by stating that TCA's website (1) engages in "denial" of the Armenian genocide in Turkey during World War I, (2) is "unreliable," (3) presents a "strange mix of fact and opinion," and (4) is an "illegitimate source of information." The defendants counter, and the district court agreed, that these are statements of opinion, rather than fact, and thus cannot support a claim of defamation.

Under Minnesota law, "[a] statement is defamatory if it (1) has been communicated to a third party; (2) is false; and (3) tends to harm the individual's reputation and lowers him or her in the community's estimation." *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995). With regard to the element of falsity, "[t]ruth is a complete defense, and true statements, however disparaging, are not actionable." *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 500 (Minn. Ct. App. 1989). Notably, "statements about matters of public concern not capable of being proven true or false and statements that cannot be interpreted reasonably as

stating facts are protected from defamation actions under the First Amendment." *Geraci*, 526 N.W.2d at 397. Whether a statement can be interpreted as stating facts is a question of law. *Id.*

With regard to the first challenged statement, TCA argues that the Center's accusation of "denial" is false because the term "denial," in the context of genocide studies, is a term of art that implies denial of well-documented underlying facts associated with a genocidal event. TCA points out that its website does not deny certain underlying historical facts about the fate of Armenians in Turkey during World War I, such as that "certainly hundreds of thousands of Armenians died during" what it characterizes as "the Armenian revolt." Under TCA's interpretation, however, the term "denial" would merely express a subjective evaluation of the credibility of the historical sources for every assertion on the TCA website, many of which TCA admits are "contested." Such an evaluation of credibility is essentially an opinion, "not capable of being proven true or false," and thus not actionable in defamation, because different historians might well come to different conclusions. *See Geraci*, 526 N.W.2d at 397. On the other hand, the "denial" statement reasonably can be construed as stating simply that the TCA website denies that the treatment of Armenians within Turkey during World War I meets the definition of the term "genocide." A statement about the content of the TCA website is capable of being proven true or false. Because the TCA website does, in fact, state that it is "highly unlikely that a genocide charge could be sustained against the Ottoman government or its successor" based on the historical evidence, the Center's statement under this interpretation is true and, thus, still not actionable. *See Foley*, 449 N.W.2d at 500.

The remaining three statements can be interpreted reasonably only as subjective opinions, rather than facts. The qualities of being reliable ("trustworthy, safe sure"), strange ("[u]nusual, abnormal"), and illegitimate ("irregular, abnormal"), *see New Shorter Oxford English Dictionary* 2536, 3083, 1309 (4th ed. 1993), each are in the eye of the beholder, and they did not appear in a context that would provide an

objective, fact-based measurement of these qualities. *See Geraci*, 526 N.W.2d at 397-98 (affirming that statements that the plaintiff "had poisoned the board," was "out of control," "a bad influence," "emotional," and "not a team player" could not reasonably be interpreted as stating facts).

TCA nevertheless argues that the four statements, taken together in context, imply a charge of scholastic fraud against TCA, and that scholastic fraud is capable of being proved true or false.[2]  To be sure, "[w]ords, which taken by themselves have an innocent meaning, in connection with surrounding circumstances, may convey a defamatory meaning to those familiar with such circumstances."  *Gadach v. Benton Cnty. Co-op Ass'n*, 53 N.W.2d 230, 232 (Minn. 1952).  In such cases, "[w]hether a defamatory meaning is conveyed is dependent upon how ordinary men understand the language used in the light of surrounding circumstances."  *Id.*  Here, however, the statements in context would not suggest to an ordinary listener that the speaker intended to level specific charges of scholastic fraud against TCA, Wikipedia, or the other listed websites, not least because websites in general are not ordinarily viewed as scholarly works.  This is particularly true of an advocacy website like the TCA site.  *See, e.g.*, *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) ("[A] company's website is a marketing tool.  Often, marketing material is full of imprecise puffery that no one should take at face value.").

Because the challenged statements either are true or cannot reasonably be interpreted as stating facts, the Rule 12(b)(6) dismissal of TCA's defamation claim also must be affirmed.

---

[2]TCA apparently defines "scholastic fraud" as an intentional falsification in a published scholarly work.

## V.  Conclusion

For the foregoing reasons, we affirm with respect to TCA's First Amendment and defamation claims, and we vacate and remand for dismissal due to lack of standing with respect to Cingilli's First Amendment claim.

_____